BURKE, Judge.
*1129 E.L.Y. was convicted of first-degree sodomy, see § 13A-6-63, Ala. Code 1975, and first-degree sexual abuse, see § 13A-6-66, Ala. Code 1975. Pursuant to § 13A-5-6(d), Ala. Code 1975, E.L.Y. was sentenced to life imprisonment without the possibility of parole for the sodomy conviction because the victim was 6 years of age or less and E.L.Y. was 21 years of age or older when the offense was committed. He was also sentenced to a concurrent term of 20 years' imprisonment for the sexual-abuse conviction. This appeal follows.
The evidence presented at trial revealed the following. E.L.Y., his wife, E.Y., and their four children lived in Thailand from October 2013 until February 2014. E.L.Y. and his wife worked as missionaries. In January 2014, E.Y. walked into a room in their house and saw their six-year-old daughter, C.Y., sitting on the bed with her skirt pulled up and her underwear around her ankles. (R. 531.) E.Y. stated that she became upset and began asking "what is going on" over and over again. (R. 533.) E.L.Y. then came out of the bathroom with shaving cream on his face and said that he did not know what she was talking about. E.L.Y. then explained to E.Y. that he had been cuddling with C.Y. when C.Y. complained that his facial hair bothered her. Therefore, E.L.Y. said, he had gone into the bathroom to shave. E.Y. testified that C.Y. would not respond when she asked her what had happened. E.Y. testified that E.L.Y. became very upset when she continued to ask him about the situation.
E.Y. stated that she talked to C.Y. again later that evening. According to E.Y., C.Y. told her that E.L.Y. "licked her private parts." (R. 541.) The next day, C.Y. disclosed to E.Y. that the incident in Thailand was not the first time E.L.Y. had had inappropriate interactions with her. C.Y. told her mother that E.L.Y. licked her private parts when the family lived in "the brick house" and when they had traveled to Indiana. E.Y. testified that C.Y. referred to their house in Calhoun County, Alabama, as "the brick house."[1] (R. 543.) E.Y. then contacted their missionary team leader, Mark Bosje, and explained the situation to him.
Bosje testified that, after speaking with E.Y., he contacted E.L.Y. and asked to speak with him about the allegations. Bosje stated that E.L.Y. came to his house and that E.L.Y. initially denied everything. However, Bosje testified that "as the conversation carried on, there was a change in the direction of the conversation. [E.L.Y.] made statements such as: Well, I have been sick, and I have been on heavy medication. A little while later, [E.L.Y.] said, maybe I was half asleep and thought it was my wife." (R. 582.) Bosje testified that E.L.Y.'s responses convinced him that E.Y. and the children needed to be removed from E.L.Y.'s home and that E.L.Y. was disqualified from serving as a missionary. Bosje then took the appropriate steps to report the situation to his superiors, to place E.Y. and her children in a safe location, and to make arrangements for E.L.Y. to return to the United States.
C.Y. testified[2] that E.L.Y. was her father. According to C.Y., she and her family *1130 had previously lived in Alabama, Indiana, and Thailand. C.Y. testified that she and her family had been missionaries in Thailand but had returned to the United States "[b]ecause [E.L.Y.] did something bad." (R. 613.) When asked what those bad things were, C.Y. stated that E.L.Y. had touched her private parts underneath her clothing with "[h]is hand, his tongue, and his private part." (R. 615.) C.Y. specifically identified the relevant body parts on an anatomical diagram. (R. 616.) In describing the events that occurred in Thailand, including her mother's discovery of the abuse, C.Y. essentially testified to the same order of events.
C.Y. went on to testify that the incident of abuse in Thailand was not the first time E.L.Y. had touched her inappropriately. C.Y. stated that E.L.Y. had also touched her inappropriately in Indiana and Alabama. When asked about the location of the incidents in Alabama, C.Y. testified that they occurred "in Anniston at the brick house." (R. 620.) C.Y. described the abuse in Alabama as being similar to the abuse in Thailand. According to C.Y., E.L.Y. touched her "front and back" private parts underneath her clothing with his hand, tongue, and his private part. (R. 621-22.) C.Y. testified that E.L.Y. would then hold her and walk up and down the hallway praying. According to C.Y., she was six years old when the abuse occurred in Alabama.
E.L.Y. testified in his own defense and admitted to touching and sodomizing C.Y. in Thailand. E.L.Y. stated:
"And for reasons I can't really tell you, I pulled [C.Y.'s] skirt down. And eventually while we were snuggling, not just her skirt but her underwear. And I touched her with my hands. And just touched her with my hands. I touched her in the private area with my hands.
"And then eventually for reasons I can't tell you, it escalated. And I actually-I did put my mouth on her private area."
(R. 710.) E.L.Y. also testified that he inappropriately touched C.Y. with his hands when they lived in Alabama. E.L.Y. stated that he and C.Y. were playing "the tickle game" and that he began tickling C.Y. on her thigh. He then stated: "And I tickled her, and I actually tickled her in her private area. I am ashamed to tell you that. I wish I could tell you why .... And I wish I could just say I only tickled her one time .... I don't remember when, but I did tickle her again more than once." (R. 726-28.) However, despite these admissions, E.L.Y. maintained that he did not put his mouth on C.Y.'s genitals when they lived in Alabama. E.L.Y. stated: "this is the crux of my whole defense of what I am saying. I did not put my mouth on my daughter at Bynum Acres Drive.[3] That did not happen. I tickled her in between her legs. I did do that." (R. 729.) E.L.Y. testified that his daughter was "not a little lying girl" but that she was mistaken about where they lived when he put his mouth on her genitals. (R. 729-30.)
E.L.Y. raises numerous issues on appeal. We will address each in turn.
Constitutional Issues
We first note that the applicable standard of review regarding E.L.Y.'s constitutional *1131 challenges to § 13A-5-6(d), Ala. Code 1975, is de novo. In State v. Adams, 91 So.3d 724, 731-32 (Ala. Crim. App. 2010), this Court noted:
" 'Where, as here, the facts of a case are essentially undisputed, this Court must determine whether the trial court misapplied the law to the undisputed facts, applying a de novo standard of review.' Continental Nat'l Indem. Co. v. Fields, 926 So.2d 1033, 1035 (Ala. 2005). 'Where the appeal concerns only questions of law, "there is no presumption of correctness in favor of the trial court's judgment; this court's review of legal issues is de novo." ' L.B.S. v. L.M.S., 826 So.2d 178, 185 (Ala. Civ. App. 2002) (quoting Morgan Bldg. & Spas, Inc. v. Gillett, 762 So.2d 366, 368 (Ala. Civ. App. 2000) ). 'In addition, "[w]hen an appellate court interprets a statute or considers the constitutionality of a statutory provision, no presumption of correctness attaches to the trial court's interpretation of the statute." ' Id. (quoting Monroe v. Valhalla Cemetery Co., 749 So.2d 470, 471-72 (Ala. Civ. App. 1999) ). An appellate court's 'review of constitutional challenges to legislative enactments is de novo.' Richards v. Izzi, 819 So.2d 25, 29 n. 3 (Ala. 2001)."
With these principles in mind, we now address E.L.Y.'s constitutional arguments.
I.
As noted, E.L.Y. was sentenced to life imprisonment without the possibility of parole pursuant to § 13A-5-6(d), Ala. Code 1975, which provides: "[I]n all cases where an offender is convicted of a sex offense pursuant to Section 13A-6-61, 13A-6-63, or 13A-6-65.1, when the defendant was 21 years of age or older and the victim was six years of age or less at the time the offense was committed, the defendant shall be sentenced to life imprisonment without the possibility of parole." E.L.Y. argues on appeal, as he did at trial, that this statute "violates the Eighth Amendment to the U.S. Constitution as per the Fourteenth Amendment and Article I Section 15 of the Alabama Constitution in that it mandates a life without parole sentence for a first time sex offender." (E.L.Y.'s brief, at 31.) According to E.L.Y., the resulting sentence constitutes cruel and unusual punishment as applied to him and "categorically to all first time sex offenders who are 21 years of age or older and whose victims are 6 years of age or less." Id. The basis of E.L.Y.'s argument is his contention that his sentence is grossly disproportionate to his crime.
In Lane v. State, 66 So.3d 830, 831 (Ala. Crim. App. 2010), this Court noted:
" 'The Eighth Amendment ... contains a "narrow proportionality principle" that "applies to noncapital sentences." ' Ewing v. California, 538 U.S. 11, 17, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), quoting Harmelin v. Michigan, 501 U.S. 957, 996-97, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). We recognized this limited principle in Wilson v. State, 830 So.2d 765 (Ala. Crim. App. 2001)."
In Wilson v. State, 830 So.2d 765 (Ala. Crim. App. 2001), this Court entertained a challenge to the constitutionality of a mandatory life-without-parole sentence for a drug-trafficking conviction. Before undertaking that analysis, this Court stated:
"At the outset, we acknowledge that determinations regarding the punishments to be imposed for different crimes are purely legislative. E.g., Rummel v. Estelle, 445 U.S. 263, 275-76, 282-84, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) ; Rocker v. State, 443 So.2d 1316, 1322 (Ala. Crim. App. 1983). We also acknowledge and affirm the oft-stated rule that we generally will not review sentences imposed within statutorily prescribed *1132 limits. E.g., Evans v. State, 794 So.2d 415, 439 (Ala. Crim. App. 2000). In Eldridge v. State, 418 So.2d 203, 207 (Ala. Crim. App. 1982), we stated:
" 'While this court may rule a fine or sentence excessive, the separation of powers doctrine forces this court not to substitute its own judgment for that of the legislature unless those constitutional guarantees of the Eighth Amendment to the U.S. Constitution or of Article I, § 15, 1901, Alabama Constitution are clearly violated. Cabble v. State, 347 So.2d 546 (Ala. Cr. App.), cert. denied, 347 So.2d 551 (Ala. 1977).' "
830 So.2d at 771.
The appellant in Wilson was a first-time drug offender who was given a mandatory sentence of life imprisonment without parole for selling morphine to an undercover police officer. Like E.L.Y., the appellant in Wilson argued that the statute, as applied to her case, violated Article I, § 15, of the Alabama Constitution, and the Eighth Amendment to the United States Constitution. This Court undertook an in-depth analysis of United States Supreme Court precedent as it related to judicial review of legislative enactments, specifically Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). This Court also analyzed precedent from Alabama courts as well as various United States Courts of Appeal. After reviewing the relevant precedents, this Court held that it was required to "apply a narrow proportionality review" to Wilson's sentence. 830 So.2d at 778, citing Harmelin, supra.
As explained in Wilson, a proportionality review requires that the appellate court first make a threshold determination whether the mandatory sentence of life imprisonment without parole is "grossly disproportionate" to the crime. If it is determined that the sentence is grossly disproportionate to the crime, then the reviewing court must go further and "conduct a full-scale proportionality review, examining the second and third Solem factors." Id. at 780, citing Harmelin, 501 U.S. at 1005, 111 S.Ct. at 2707. Those additional "Solem factors" require the court to examine the punishment imposed on other offenders in the same jurisdiction and the punishment the offender would have received had the crime been committed in another jurisdiction. The Wilson court concluded that the mandatory life-imprisonment-without-parole sentence was grossly disproportionate to the specific acts that constituted Wilson's crime. The Court then went on to find that Wilson's sentence was more extreme than sentences imposed on similar offenders in Alabama and that Wilson would have received a "much more lenient sentence in many other jurisdictions." Id. at 780. Accordingly, this Court held that, after a careful analysis of the above-mentioned factors, it was convinced that "the statute mandating imposition of a life without parole sentence is unconstitutional, as it is applied to this defendant for the commission of this crime." Id. at 781. We find E.L.Y.'s case to be distinguishable.
In order to analyze the constitutionality of E.L.Y.'s sentence, this Court must first make a threshold determination whether E.L.Y.'s sentence is grossly disproportionate to his crime. In Wilson, this Court held:
"Application of Harmelin mandates that we make a threshold determination in this case by considering whether the mandatory sentence of life imprisonment without parole imposed in Wilson's case is grossly disproportionate to her crime. To perform this analysis, we must consider the gravity of the offense and the *1133 harshness of the punishment. Solem, 463 U.S. at 290-91, 103 S.Ct. 3001. The United States Supreme Court noted in Solem that no single factor determines when a sentence is grossly disproportionate, and it offered a nonexhaustive list of factors to be considered when a court is assessing the severity of a crime. These factors include consideration of the circumstances of the crime, the harm caused to the victim or to society, the culpability of the offender, and the offender's motive in committing the crime. Id. at 290-94, 103 S.Ct. 3001."
830 So.2d at 778.
Turning to the factors set out in Solem, we find that the circumstances of the crime here are extremely grave. As noted, E.L.Y. was convicted of engaging in deviate sexual conduct with his daughter when she was six years of age and younger. E.L.Y. even admitted to some of the incidents but denied that they occurred in Alabama. Such acts have been determined to be among the most serious and grave offenses that can be committed in the State of Alabama. This is evidenced by the legislature's decision to classify first-degree sodomy as a Class A felony, see § 13A-6-63(b), Ala. Code 1975, the same classification given to crimes such as murder, rape, and first-degree robbery. The circumstances of E.L.Y.'s offense are even more grievous in that the crime was perpetrated against his young daughter in their home.
This Court also finds that the harm caused to C.Y. was especially severe for several reasons. First, the crimes were committed by her father, a person C.Y. should have been able to look to for support and protection. The crimes were also committed on more than one occasion and in multiple locations. Based on C.Y.'s age at the time the offenses were committed, it is likely that she has no memory of a home in which she was not sexually abused. E.L.Y. claims in his brief that "it is questionable what, if any, long term effects will be to the child victim." (E.L.Y.'s brief, at 37 (emphasis added).) We find this assertion wholly absurd. E.L.Y. states in his brief that the sexual abuse he experienced as a child was a factor in his eventual decision to abuse his child. To then argue that his abuse of C.Y. may not have long-term effects on her is disingenuous at best.
E.L.Y. also attempts to diminish his culpability for the offense by asserting that he has no criminal history, that his conduct was not violent, and that he was sexually abused as a child. (E.L.Y.'s brief, at 32-33.) E.L.Y. cites cases such as Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in support of his contention that he is less culpable and less deserving of severe punishment. However, those cases are inapposite. Graham and Roper involved issues regarding the culpability of juveniles, and Atkins dealt with issues surrounding the culpability of intellectually disabled defendants. E.L.Y. was an adult when he committed the charged crimes, and he was not intellectually disabled. In fact, E.L.Y. testified that he was the valedictorian of his high-school class, that he graduated near the top of his class in college, and that he studied at a Bible college before becoming a missionary. While we recognize that E.L.Y. had no criminal history and that he was affected by the abuse he endured as a child, we do not find that his culpability was diminished in any significant way.
Finally, E.L.Y. points to the expert testimony he presented at trial regarding different types of sex offenders and their prospects of rehabilitation. E.L.Y.'s expert, *1134 Dr. Frankie Preston, testified that E.L.Y. fell into a class of sex offenders who were susceptible to rehabilitation and less likely to re-offend compared to other types of sex offenders. Dr. Preston also testified that there was no scientific basis for the legislature's age classifications in § 13A-5-6(d). This Court has considered that testimony and does not find it to be persuasive. For these reasons, we do not conclude that E.L.Y.'s sentence is grossly disproportionate to his crime. Accordingly, we need not examine the remaining Solem factors discussed in Wilson. The legislature was within its rights to determine that offenders such as E.L.Y., who commit sex crimes against very young children, are deserving of one of the harshest punishments meted out by the State. Thus, we hold that E.L.Y.'s sentence of life imprisonment without the possibility of parole is not unconstitutional as cruel and unusual punishment.
II.
Next, E.L.Y. argues that the act that amended § 13A-5-6, Ala. Code 1975, to add subsection (d) was unconstitutional "in that it violated Article IV, Section 63 of the Alabama Constitution of 1901, which requires a bill to be read three (3) different days." (E.L.Y.'s brief, at 42.) E.L.Y. also argues that the bill violated § 45 of Art. IV because, he says, the subject of the bill was not clearly stated.
Article IV, § 63, of the Alabama Constitution, provides:
"Every bill shall be read on three different days in each house, and no bill shall become a law, unless on its final passage it be read at length, and the vote be taken by yeas and nays, the names of the members voting for and against the same be entered upon the journals, and a majority of each house be recorded thereon as voting in its favor, except as otherwise provided in this Constitution."
E.L.Y. asserts in his brief that the original bill that was introduced during the 2011 legislative session sought to amend § 13A-5-40, Ala. Code 1975, to make first-degree rape, first-degree sodomy, and first-degree sexual torture, when the victim was a young child, capital offenses. The house judiciary committee amended the bill and presented a substitute version removing the possibility of a death sentence and instead amending § 13A-5-6, Ala. Code 1975, to provide for a mandatory life-imprisonment-without-parole sentence upon conviction of any of the above-mentioned offenses. E.L.Y. claims that this substitute bill was not read on three different days and, therefore, violates the three-readings requirement of the Alabama Constitution.[4]
In Magee v. Boyd, 175 So.3d 79, 114 (Ala. 2015), the Alabama Supreme Court addressed a similar argument:
"In the present case, it is clear that the substitute version of HB 84 was not read 'on three different days' in each house. However, we hold that an amended bill or a substitute bill, if germane to and not inconsistent with the general purpose of the original bill, does not have to be read three times on three different days to comply with § 63. The legislature complies with the three-readings requirement if the three readings include the version before the substitution was made. On their face, the legislative journals indicate three readings of HB 84 in both houses even though the substitute version was read only once in each house. This practice complies with *1135 § 63 so long as the original bill and the amended or substitute bill are not vitally altered so that there is no longer a common purpose or relationship between the original bill and the amended or substitute bill."
E.L.Y. argues that, because the substitute bill amended a different section of the criminal code, the substitute "varies substantially" from the original bill and consequently failed to comply with the three-readings requirement. We disagree.
As noted, the original bill sought to make certain sex crimes perpetrated against very young children capital offenses punishable by death or life imprisonment without the possibility of parole, while the substitute version merely removed the possibility of a death sentence. It is clear that the legislative intent behind the original bill was to create a certain class of offenders deserving of the most serious punishments available. The substitute bill was not inconsistent with that purpose. Thus, we do not find that the bill was so "vitally altered so that there [was] no longer a common purpose or relationship" between the two bills. 175 So.3d at 114. Accordingly, the act creating § 13A-5-6(d), Ala. Code 1975, satisfied the three-readings requirement of the Alabama Constitution.
E.L.Y. also asserts that the act in question violated Art. IV, § 45, of the Alabama Constitution, which provides, in pertinent part, that "[e]ach law shall contain but one subject, which shall be clearly expressed in its title." According to E.L.Y., the subject of the bill was not clearly stated because, he says, the synopsis of both the original bill and the substitute bill sought to punish offenders whose victims were "under six (6) years of age" while the body of the substitute bill identified the relevant victims as being "six (6) years of age and under." (E.L.Y.'s brief, at 44.) E.L.Y. argues that this ambiguity renders the statute unconstitutional.
Although the ambiguity appears in both the synopsis and the body of both the original bill and the substitute bill, the ambiguity does not appear in the title and body of the substitute bill. The title of the substitute bill states: "A BILL TO BE ENTITLED AN ACT [t]o amend Section 13A-5-6, Code of Alabama 1975; to provide that certain defendants convicted of certain sex offenses would be sentenced to life imprisonment without the possibility of parole ...." (C. 133.) The body of the substitute bill then provides that the mandatory life-imprisonment-without-parole sentence applies "when the defendant was 21 years of age or older and the victim was six years of age or less at the time the offense was committed." (C. 135.) The title of a bill and the synopsis of a bill are not the same thing. Section 45 of Art. IV of the Alabama Constitution speaks only to the titles of bills and not their synopses. E.L.Y. has cited no authority for the proposition that a small disparity or ambiguity between the synopsis of a bill and its body renders it unconstitutional. See Rule 28(a)(10), Ala. R. App. P. Accordingly, E.L.Y. is due no relief on this issue.
III.
Next, E.L.Y. argues that his sentence violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitutions as well as Art. I, § 6, of the Alabama Constitution. The crux of E.L.Y.'s argument is his contention that there is no rational basis for classifying offenders based on the age of the victim. In support of that proposition, E.L.Y. cites State v. Adams, 91 So.3d 724 (Ala. Crim. App. 2010), in which this Court held that portions of the Community Notification Act, see § 15-20-22(a)(1), Ala. Code 1975, were *1136 unconstitutional because they created a de facto classification of sex offenders based solely on their economic status. ("The statute the legislature enacted, however, unconstitutionally subjects indigent homeless sex offenders to a denial of their liberty based solely on their inability to pay.")
However, § 13A-5-6(d), Ala. Code 1975, does not create a classification based on economic status or on any other constitutionally suspect class. This Court has held that classifications based on the age of the victim do not violate the Equal Protection Clause or the Due Process Clause. In Blackmon v. State, 7 So.3d 397, 416 (Ala. Crim. App. 2005), citing Ex parte Woodard, 631 So.2d 1065, 1073 (Ala. Crim. App. 1993), this Court held:
" 'The child-murder provision is not arbitrary and does not violate any equal protection right.
" ' " 'The Equal Protection Clause of the Fourteenth Amendment goes no further than to prohibit invidious discrimination.... If there is some reasonable basis for the recognition of separate classes, and if the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the Constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to achievement of the State's objective; the separate treatment must admit of but one conclusion beyond a rational doubt, i.e., that the basis therefore is arbitrary and unreasonable and without relevance to the legislative goal.' "
" ' Goodson v. State, 588 So.2d 509, 514 (Ala. Cr. App. 1991) (quoting State v. Thompson, 133 N.J.Super. 180, 336 A.2d 11, 14 (1975) ). " 'Because the statute does not proscribe activities that are legally protected and does not involve any legally cognizable "suspect" class, "the classification must be upheld if 'any state of facts rationally justifying it is demonstrated to or perceived by the court.' " United States v. Holland, 810 F.2d 1215, 1219 (D.C.Cir.), cert. denied, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987).' " Hardy v. State, 576 So.2d 685, 686 (Ala. Cr. App. 1991) (" 'The legislature of Alabama "wanted to lessen the risk that drugs would be readily available to school children. It is surely rational to achieve that goal by increasing penalties for those who sell drugs near schools." ' "). Here, the classification adopted by the Legislature of child-murder as a capital offense is not arbitrary and capricious, but reasonable and appropriate.
" '....
" 'It is the holding of this Court that Ala. Code 1975, § 13A-5-40(a)(15), is not unconstitutional.' "
Thus, classifying offenders based on the age of their victims is not unconstitutional, and E.L.Y. is due no relief on this issue.
Evidentiary Issues
IV.
Next, E.L.Y. argues that the trial court erred by allowing the State, pursuant to Rule 404(b), Ala. R. Evid., to introduce evidence regarding collateral acts of sodomy and sexual abuse that occurred outside Alabama. Rule 404(b), Ala. R. Evid., provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal *1137 case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
According to E.L.Y., the collateral-act evidence was severely prejudicial and failed to meet any recognized exception set out in Rule 404(b).
We first note that "[t]he question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000). "The admission or exclusion of evidence is a matter within the sound discretion of the trial court." Taylor v. State, 808 So.2d 1148, 1191 (Ala. Crim. App. 2000).
E.L.Y. argues that the State "proceeds under the twisted, but appealing, logic of making Ala. R. Evi[d]. 404(b)'s 'motive' exception imply that being a pedophile is itself a motive." (E.L.Y.'s brief, at 50.) E.L.Y. claims that because he admitted to molesting and sodomizing his daughter in Thailand, there was no need for the State to prove his motive for sodomizing her in Alabama. However, this Court has held:
" 'Ordinarily, a prior act of sexual abuse would be inadmissible under Rule 404(b). However, in this case, the alleged prior bad act was offered for the specific purpose of proving motive.
" ' " 'Motive is defined as "an inducement, or that which leads or tempts the mind to do or commit the crime charged." Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as "that state of mind which works to 'supply the reason that nudges the will and prods the mind to indulge the criminal intent.' " [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
" ' " 'Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala. Cr. App. 1986). " 'It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' McAdory v. State, 62 Ala. 154 [ (1878) ]." Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).' "
" ' Hatcher v. State, 646 So.2d 676, 679 (Ala. 1994) (emphasis added).' "
Bedsole v. State, 974 So.2d 1034, 1038-39 (Ala. Crim. App. 2006), quoting Estes v. State, 776 So.2d 206, 210-11 (Ala. Crim. App. 1999). Accordingly, the trial court did not err by allowing the State to present evidence of E.L.Y.'s collateral acts of sexual abuse.
The collateral-act evidence was also admissible for another purpose. The testimony about the abuse in Thailand was necessary in order for the State to tell the complete story of how the abuse was discovered and eventually reported to the police. "Evidence of a defendant's criminal actions during the course of a crime spree is admissible." Doster v. State, 72 So.3d 50, 88 (Ala. Crim. App. 2010), citing Phinizee v. State, 983 So.2d 322, 330 (Miss. App. 2007) ("Evidence of prior bad acts is admissible to '[t]ell the complete story so as not to confuse the jury.' "). Accordingly, the trial court was well within its discretion to allow the State to present evidence of E.L.Y.'s collateral acts of sodomy and sexual abuse.
V.
E.L.Y. next argues that his conviction should be reversed because he was *1138 not allowed to be physically present in the courtroom when the seven-year-old victim was giving her video deposition. According to E.L.Y., this violated the Confrontation Clause of the Sixth Amendment to the United States Constitution and Art. I, § 6, of the Alabama Constitution. The only authority E.L.Y. cites in support of his contention is an old version of § 15-25-2, Ala. Code 1975, which, prior to being amended in 2007, provided that such videotaped depositions were to be conducted in the presence of the defendant and his attorney. However, the current version of § 15-25-2(c), Ala. Code 1975, provides:
"During the taping of a videotaped deposition authorized pursuant to this section, the following persons shall be in the room with the child: The prosecuting attorney, the attorney for the defendant, and a person whose presence, in the judgment of the court, contributes to the well-being of the child and who has dealt with the child in a therapeutic setting regarding the abuse. Additional persons, such as the parent or parents or legal guardian, other than the defendant, may be admitted into the room in the discretion of the court."
Section 15-25-2(j), Ala. Code 1975, provides that "the defendant shall be provided access to view the testimony out of the presence of the child and shall be allowed to communicate with his or her attorney by any appropriate election method." The record indicates that the trial court fully complied with § 15-25-2. Defense counsel was in the room with the victim and was able to cross-examine her. E.L.Y. was allowed to watch a live video feed from another room in the courthouse and to communicate with his attorney during C.Y.'s testimony. Accordingly, E.L.Y. is due no relief on this issue.
VI.
Next, E.L.Y. asserts that the State presented insufficient evidence to sustain his conviction for first-degree sodomy.[5] Specifically, E.L.Y. argues that the State failed to prove that the deviate sexual intercourse occurred in the State of Alabama and that the trial court erred by denying his motion for a judgment of acquittal. E.L.Y. concedes that C.Y. testified "that he touched her with his hand, mouth, and 'private part' in Alabama." (E.L.Y.'s brief, at 62), quoting (R. 631.) However, E.L.Y. claims that when C.Y. was asked to describe the room in Alabama where the abuse occurred, she gave a description of her room in Thailand.
In Breckenridge v. State, 628 So.2d 1012, 1018 (Ala. Crim. App. 1993), this Court held:
"In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala. Crim. App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala. Crim. App.), cert. denied, 387 So.2d 283 (Ala. 1980). The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty.
*1139 Thomas v. State, 363 So.2d 1020 (Ala. Crim. App. 1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala. Crim. App. 1983) ; Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969) ; Willis v. State. A verdict of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust. Duncan v. State, 436 So.2d 883 (Ala. Crim. App. 1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984) ; Johnson v. State, 378 So.2d 1164 (Ala. Crim. App.), cert. quashed, 378 So.2d 1173 (Ala. 1979)."
A review of the record reveals that C.Y. testified that E.L.Y. touched her genitals with his mouth in both Alabama and Thailand. (R. 629-30.) The State then asked: "Now, when that did happen in Alabama, where did it happen? What was the color of the room? Describe that for me." (R. 630.) C.Y. responded: "It was in the brick house in the living room. And then after he did the bad stuff in the living room, he went to the hallway. He walked back and forth praying." (R. 630.) Accordingly, there was sufficient evidence from which the jury could conclude that E.L.Y. engaged in deviate sexual intercourse with C.Y. in Alabama by putting his mouth on her genitals. We note that later in her testimony, C.Y. stated that the abuse happened two times in Thailand, two times in Indiana, and one time in Alabama. (R. 630.) The State again asked C.Y. about the room the abuse occurred in and C.Y. responded by describing her room in Thailand. However, "it is well settled that '[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury.' " Cosper v. State, 89 So.3d 186, 191-192 (Ala. Crim. App. 2010), quoting Smith v. State, 698 So.2d 189, 214 (Ala. Crim. App. 1996), aff'd, 698 So.2d 219 (Ala. 1997). Accordingly, the trial court correctly denied E.L.Y.'s motion for a judgment of acquittal.
VII.
Next, E.L.Y. argues that the trial court erred by admitting evidence of his Miranda [6] waiver and subsequent confession because, he says, they were unconstitutionally procured by the State. According to E.L.Y., his Miranda waiver was involuntary because, he says, his will was overborne by the pressure of having to assess the legal implications surrounding his confession, he was extremely tired, and he lacked legal training.
The State bears the burden of establishing the admissibility of a defendant's out-of-court statement. This Court has stated:
"The general rule is that a confession or other inculpatory statement is prima facie involuntary and inadmissible and the burden is on the State to prove by a preponderance of the evidence that such a confession or statement is voluntary and admissible. See, e.g., Ex parte Price, 725 So.2d 1063 (Ala. 1998). To prove voluntariness, the State must establish *1140 that the defendant 'made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.' Lewis v. State, 535 So.2d 228, 235 (Ala. Crim. App. 1988). If the confession or inculpatory statement is the result of custodial interrogation, the State must also prove that the defendant was properly advised of, and that he voluntarily waived, his Miranda rights. See Ex parte Johnson, 620 So.2d 709 (Ala. 1993), and Waldrop v. State, 859 So.2d 1138 (Ala. Crim. App. 2000), aff'd, 859 So.2d 1181 (Ala. 2002)."
Eggers v. State, 914 So.2d 883, 898-99 (Ala. Crim. App. 2004). "The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong." Jackson v. State, 562 So.2d 1373, 1381 (Ala. Crim. App. 1990).
The trial court conducted a pretrial suppression hearing and heard testimony from Officer Kyle Price from the Anniston Police Department. Officer Price testified that he interviewed E.L.Y. on January 31, 2014, at the Anniston police station. According to Officer Price, he first made contact with E.L.Y. at a hotel E.L.Y. was staying in. When Price told E.L.Y. that he wanted to discuss the allegations that had been made against him, Price stated that E.L.Y. "immediately began attempting to ... defend his actions." (R. 127.) Officer Price testified that he stopped E.L.Y. from making any further statements and told him that he needed to read him his Miranda rights and to conduct the interview at the police station so that it could be videotaped. According to Officer Price, E.L.Y. agreed and voluntarily accompanied him to the police station.
Once they arrived, Officer Price stated, he read the standard Miranda waiver form to E.L.Y. and E.L.Y. signed the form, indicating that he understood his rights and that he wished to speak with police. A copy of that form was admitted into evidence. (C. 117.) Officer Price testified that E.L.Y. did not appear to be under the influence of drugs or alcohol; that he did not appear fatigued; and that nothing about E.L.Y.'s demeanor or the manner in which he answered questions indicated that E.L.Y. was impaired in any way. Officer Price also testified that E.L.Y. never asked to stop the interview for any reason and never asked to speak with an attorney. Finally, Officer Price stated that he did not use any threats, violence, or other coercive techniques to procure E.L.Y.'s waiver or subsequent statement.
On appeal, E.L.Y. asks this Court to consider E.L.Y.'s alleged fatigue and his lack of understanding regarding the legal consequences of confessing to crimes in multiple jurisdictions. However, as noted above, the State presented uncontested evidence establishing that E.L.Y. was not impaired when he waived his rights and that he was not coerced to do so in any way. During cross-examination, defense counsel implied that E.L.Y. had been awake for two days when he gave his statement to Officer Price. However, E.L.Y. offered no testimony or additional evidence to establish that he had been awake for two days or that he was impaired in any other way when he waived his Miranda rights. Accordingly, we find that the trial court's decision to deny E.L.Y.'s motion to suppress was supported *1141 by the record and was not contrary to the law.
VIII.
E.L.Y. next asserts that his convictions are due to be reversed because, he says, the indictments charging him with first-degree sodomy and first-degree sexual abuse were fatally defective. Specifically, E.L.Y. claims that the indictments failed to allege the specific conduct for which he was being charged as well as a specific date the conduct was alleged to have occurred. This Court has held:
" 'Appellate courts review the legal sufficiency of indictments de novo.' Hunt v. State, 642 So.2d 999, 1022 (Ala. Crim. App. 1993) (citing United States v. Schmidt, 947 F.2d 362, 369 (9th Cir.1991) ). Further, '[a]n indictment " 'must clearly inform the accused of the offense with which he is being charged and must do so in language that is readily understood by the ordinary person.' " ' Vaughn v. State, 880 So.2d 1178, 1192 (Ala. Crim. App. 2003) (quoting Dobyne v. State, 805 So.2d 733, 750 (Ala. Crim. App. 2000), quoting in turn Thatch v. State, 432 So.2d 8, 10 (Ala. Crim. App. 1983) ). To that end, § 15-18-25, Ala. Code 1975, provides:
" 'An indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force of arms" or "contrary to the form of the statute" necessary.'
"Similarly, Rule 13.2(a), Ala. R. Crim. P., mandates:
" 'The indictment or information shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment.'
"However, ' "[u]nder our system of pleading, indictments are rather a statement of legal conclusions, than of facts." ' Ex parte Behel, 397 So.2d 163, 165 (Ala. 1981) (quoting Hochman v. State, 265 Ala. 1, 91 So.2d 500 (1956) ). Thus, '[a]n indictment is sufficient if it charges an offense in the language of a statute, and it need not set up proof necessary to a conviction.' Ex parte Behel, 397 So.2d at 165 (citing Finley v. State, 28 Ala. App. 151, 181 So. 123 (1938) ). Accordingly, '[a]n indictment that tracks the language of the statute is sufficient [to inform the accused of the offense with which he is being charged] if the statute prescribes with definiteness the essential elements of the offense.' Tompkins v. State, 898 So.2d 875, 877 (Ala. Crim. App. 2004) (citation omitted). The ' " 'particulars as to manner, means, place or circumstances [of the offense] need not in general be added to the statutory definition.' " ' Smith v. State, 797 So.2d 503, 514 (Ala. Crim. App. 2000) (quoting People v. Soto, 74 Cal. App. 3d 267, 272-73, 141 Cal.Rptr. 343, 346 (1977), quoting in turn People v. Britton, 6 Cal.2d 1, 5, 56 P.2d 494, 496 (1936) )."
State v. Davis, 195 So.3d 1067, 1068-69 (Ala. Crim. App. 2015).
E.L.Y.'s indictments alleged, in pertinent part, the following:
"[E.L.Y.] ... being a male sixteen years of age or older, to-wit: twenty-one (21) years of age or older, did, on or about *1142 sometime between and or including the dates of January 1, 2013 through January 31, 2014, engage in deviate sexual intercourse with [C.Y.], a female, who was less than twelve years of age, to-wit; six (6) years of age or less, in violation of Section 13A-6-63 of the Code of Alabama."
"....
"[E.L.Y.] being a male sixteen years of age or older, did, on or about sometime between and or including the dates of January 1, 2013 through January 31, 2014, subject to sexual contact [C.Y.], a female, who was less than twelve years of age, in violation of Section 13A-6-66 of the Code of Alabama."
(C. 22, 252.) Thus, E.L.Y.'s indictments tracked the language of the statutes he was charged with violating, they identified the victim, and they stated a time frame in which the offenses were alleged to have occurred. Accordingly, the indictments were not fatally defective.
E.L.Y. also argued that there are at least four different ways that a person can commit sodomy and that the indictment failed to allege the particular method of deviate sexual intercourse E.L.Y. was charged with committing. However, before trial, E.L.Y. moved for a more definite statement pursuant to Rule 13.2(e), Ala. R. Crim. P. After a hearing on the matter, the prosecutor stated that she did not "object to amending the indictment on the Sodomy I only to say, to wit by putting his mouth on her sex organ." (R. 21.) Thus, E.L.Y. was given adequate notice of the specific charges for which he was called to defend. Accordingly, he is due no relief on this issue.
IX.
Finally, E.L.Y. argues that his convictions are due to be reversed because, he says, "the cumulative errors in the case, including all errors addressed above, have affected [his] substantial right to a fair trial." (E.L.Y.'s brief, at 76.) Because this Court has found no errors with respect to E.L.Y.'s trial, convictions, and sentences, the cumulative-error doctrine does not apply. See Ex parte Woods, 789 So.2d 941, 942, n. 1 (Ala. 2001) ("A correct statement of the law would be that, when no one instance amounts to error at all (as distinguished from error not sufficiently prejudicial to be reversible), the cumulative effect cannot warrant reversal. In other words, multiple nonerrors obviously do not require reversal.").
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
Windom, P.J., and Kellum and Joiner, JJ., concur.
Welch, J., concurs in the result.

E.Y. testified to the address of the brick house and stated that it was in Calhoun County. (R. 552.)

C.Y. was seven years old when she testified. Pursuant to § 15-25-2, Ala. Code 1975, her testimony was taken by means of a videotaped deposition that was played for the jury during E.L.Y.'s trial. The record indicated that defense counsel was present during C.Y.'s testimony and was able to cross-examine C.Y. The record also reveals that E.L.Y., though not physically present for the testimony, was able to watch a live video feed and to communicate with defense counsel during C.Y.'s testimony.

Prior testimony indicated that, when the family lived in Alabama before moving to Thailand, they lived on Bynum Acres Drive in Calhoun County.

E.L.Y. concedes that the substitute bill was read on two different days and that the original bill was read on another day.

E.L.Y. does not challenge the sufficiency of the evidence regarding his first-degree sexual abuse conviction.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).